DORIS E. MELSA, DECEASED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent FRED J. MELSA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Melsa v. Commissioner
Docket Nos. 1729-74, 1935-74.
United States Tax Court
T.C. Memo 1977-415; 1977 Tax Ct. Memo LEXIS 29; 36 T.C.M. (CCH) 1687; T.C.M. (RIA) 770415; November 30, 1977, Filed Fred J. Melsa, prose.
Charles R. Billings, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax pursuant to *30 section 6653(b): [1]
Docket No. 1935-74--Fred J. Melsa
Section 6653(b) Year
Deficiency
Addition to Tax
1966
$22,534.09
$11,267.05
1967
14,140.42
7,070.21
1968
15,895.63
7,947.82
1969
13,350.61
6,675.31
Docket No. 1729-74--Doris E. Melsa, Deceased
1966
$22,534.09
$11,267.05
1967
14,140.42
7,070.21
1968
15,895.63
7,947.82
Certain concessions having been made by petitioner, [2] Fred J. Melsa, the following issues remain for decision: 1. Whether petitioner diverted funds from Pierre Fruit Company, Inc. (the corporation) to his personal use during 1966 through 1969. 2. Whether petitioner realized income in 1966 through 1969 from the processing of deer and antelope which was not reported on his Federal income tax returns for those years. 3. Whether petitioner realized income of $1,440 in both 1966 and 1967 in the form of the value of food taken from the corporation for his family's consumption. 4. Whether petitioner is entitled to exclude from income for 1967 and *31 1968 sick pay, attributable to Doris, of $1,282.82 and $2,905, respectively, where no wage continuation plan was in effect for the employees of the corporation. 5. Whether petitioner should be allowed a meal expense deduction of $40 pursuant to section 162(a)(2) which he claimed on his 1968 Federal income tax return. 6. Whether any part of the underpayments by petitioners for 1966 through 1968 and Fred, individually, for 1969 was due to fraud with intent to evade tax within the meaning of section 6653(b) so as to render petitioners liable for additions to tax. FINDINGS OF FACT 1. General
At the time his petition in docket No. 1935-74 was filed, petitioner Fred J. Melsa was a legal resident of Pampa, Texas. For 1966 through 1968, he and Doris E. Melsa (Doris) timely filed joint Federal income tax returns with the Internal Revenue Service, Aberdeen, South Dakota. Petitioner was divorced from Doris in December 1969, and he filed a separate Federal income tax return for that year with the Internal Revenue Service, Dallas, Texas. All of *32 the returns were based on the cash receipts and disbursements method of accounting. At the time the petition was filed in docket No. 1729-74, Doris had been declared incompetent and was committed to the Yankton State Hospital in Yankton, South Dakota. Gloria Jean Bauman, her niece and guardian, filed the petition. Prior to trial, in December 1975, Doris passed away. She had no estate to be probated, and no administration proceedings were initiated. Notice was given to her only known heir, [3] but there was no appearance at the trial. The action filed on her behalf (docket No. 1729-74), insofar as it related to income tax deficiencies, was dismissed for lack of prosecution. [4] The additions to tax under section 6653(b) in her case remain in issue. *33 2. Diverted Corporate Income
During 1966 through December 8, 1969, Fred and Doris owned all except 1 or 2 shares of Pierre Fruit Company, Inc. (the corporation), a corporation engaged in the business of operating a grocery store and meat market in Pierre, South Dakota. Gloria Jean Bauman owned the other 1 or 2 shares. Like many other similar businesses, the store had checkout and produce counters located near the front door, a meat counter in the rear, and the grocery counters in the middle of the room. Doris operated the cash register situated at the checkout counter. Fred, an experienced butcher, was in charge of the meat counter. An employee, Frank C. Strutz, (Strutz), who had been with the corporation since Fred and Doris purchased the business in late 1959, ran the produce counter. During the years in issue, Fred, Doris, or Strutz, the store's three main employees, counted the daily receipts and made the required bank deposits. The normal procedure was for the person who closed the store to make a record of the receipts as reflected by the cash register tape. The checks, bills, and coins in the cash register were counted. These amounts were recorded on an adding *34 machine tape, and the total therefrom compared with the cash register figures. Only minor discrepancies were ever found. Each night (except Saturday), when the store closed, the checks and money, along with the cash register tape and adding machine tape, were put in a locked bag and placed in the bank's night depository where they remained until the next morning. The key to the bag was kept in the store's cash register. Fred usually opened the store in the mornings. He would usually pick up the bag at the bank between 7:30 and 8:00 a.m. and open the store at approximately 8:00 a.m. Not until early afternoon was a bank deposit slip prepared reflecting a breakdown of the checks, currency, and coin, included in the deposit for the prior day.These deposit slips were prepared by Fred, Doris, or Strutz.Only by chance would the person who closed the store at night prepare the bank deposit slip for the following day. Deposits were made nearly every day. On Saturday nights the bank's night depository was closed, and the locked sack was kept hidden in the store until a deposit could be made the following Monday afternoon. Although the adding machine tape total from the previous day's *35 business was usually approximately the same as the bank deposit slip total, the total amount of the checks listed on the bank deposit slip was usually higher and the currency lower than the corresponding amounts on the adding machine tape. Not all the adding machine tapes are available. For 7 days in 1969, from September 2 through September 9, Fred was away from Pierre for medical reasons. The deposit slips covering this period continued to show check amounts in excess of the corresponding amounts on the adding machine tapes. Fred left the store after his divorce in December 1969. The corporation's bank deposit slips for the period February 17, 1970, to April 27, 1970, show that the total amount of checks deposited continued to exceed the total cash deposited. Many of the corporation's customers charged their purchases. Since the charge account records were kept next to the cash register, most of the customers settled their accounts with Doris. Statements of account were not sent to every customer, and those customers who did not receive statements would have to determine their account balances while in the store. They often paid their accounts by using checks in amounts *36 in excess of the amount due. If the daily bank deposit had not been made, the excess amounts of these checks were substituted for the currency shown on the deposit slip. Similar exchanges occurred when a customer cashed a check in the store. Many regular customers, known to the Melsas, cashed both personal and payroll checks at the store. In addition Doris would often replenish the $60 working capital retained from the preceding day's receipts by substituting checks received during the day for currency awaiting deposit. During the hunting seasons in the years in question, Fred processed deer and antelope killed by hunters. The store facilities were used for this activity. At times, hunters would bring a carcass into the store, and Fred would skin it, cut it up as directed, and package it. Occasionally a hunter would skin and cut up the carcass himself and would bring the meat into the store to be smoked or processed into sausage. Fred sent this meat to the New Underwood Locker, located in New Underwood, South Dakota, for smoking or processing. Fred did not keep complete records on his game processing activity. For 1966 and 1967, approximately 50 deer and antelope per year *37 were processed. In 1968, about 100 carcasses were brought in. By 1969, this number had increased to about 150. The entire processing charge for a deer in 1966 and 1967 was approximately $15; for 1968 the charge was between $20 and $25; and for 1969 it was up to $30. The cost of processing antelope was somewhat less than for deer. The income from this activity was not all reported on either the corporation's Federal income tax returns for 1966 through 1969 or on Fred and Doris' 1966, 1967, or 1968 joint Federal income tax returns or on Fred's 1969 individual Federal income tax return. The corporation's Federal income tax returns reflected the following: Year
Gross Receipts
1966
$289,445.69
1967
257,900.99
1968
236,894.26
1969
248,550.59
On two occasions, November 18, 1966, and February 25, 1967, Fred deposited checks of $160.60 and $152.99, respectively, payable to the corporation in his personal account in the Draper State Bank, Draper, South Dakota. The checks had been received as refunds due the corporation from its suppliers. Draper was approximately 70 miles from Pierre. Fred maintained an account there so that the bank would agree to give *38 him a family insurance plan. Until their divorce in December 1969, Fred and Doris lived in a house which they purchased in the late 1940's. The house and its furnishings were not expensive. Fred and Doris tried to purchase a new car every year. Although they had owned Fords and Chevrolets, in 1969 they purchased a Cadillac. In addition, they owned a 1969 Ford pickup truck. At times Fred carried large amounts of money in his billfold. Fred's and Doris' joint Federal income tax returns for 1966 through 1968, and Fred's 1969 individual Federal income tax return, all of which were prepared by a public accountant, disclosed the following: Year
Wages
Gross Income
1966
$16,000.00
$16,800.00
1967
4,000.00
3,450.18
1968
12,000.00
8,981.86
1969
5,500.00
5,541.69
Fred and Doris were divorced in December 1969.The divorce decree gave Fred possession of the 1969 Ford pickup truck and his personal belongings. The remainder of the couple's assets, including all of the corporation's stock, was retained by Doris. Subsequent to the divorce, when Fred's employment with the corporation terminated, the business of the corporation continued much as it had *39 prior thereto. However, Strutz, although not a shareholder, became more influential in the corporation's operations. In a letter to Fred, dated January 28, 1970, signed as the corporation's business manager, Strutz demanded that Fred pay back money which he claimed Fred had embezzled from the corporation. In this letter, Strutz asserted that Fred failed to turn over money due the corporation which he received for the deer and antelope processing and payments on charge accounts. 3. Groceries Issue
Periodically during the years in question, Fred took groceries from the store for his family's consumption without paying for them. The value of such groceries amounted to $1,440 in each of the years 1966 and 1967. 4.Travel Expenses
After a fire in February 1968 destroyed the building in which the store was located, Fred made occasional trips looking for shelving and other fixtures needed to refurnish the store. On these trips he was occasionally accompanied by an employee. Only once did he stay overnight.The 1968 Federal income tax return shows total expenses $60of incurred by him for his own meals. 5. Sick Pay
During 1967 and 1968 the corporation did not *40 have a sick-pay plan in effect for its employees. On advice from their accountant, however, Fred and Doris excluded $1,282.82 and $2,905 from their reported gross income as sick pay for 1967 and 1968, respectively. The payments were attributable to Doris. In the notices of deficiency for 1966 through 1969, respondent determined that petitioner's gross income should be increased as follows: 1966
1967
1968
1969
Value of groceries taken
from the corporation for
personal consumption
$ 1,440.00
$ 1,440.00
Unreported income of the
corporation, diverted to
personal use: (a) Refund checks de-
posited to personal
account
110.10
152.99
(b) Deer and antelope
processing income
5,000.00
5,000.00
$ 7,600.00
$ 3,800.00
(c) Other diverted
income
45,010.06
35,189.05
27,178.59
24,753.64
Total
$51,560.16
$41,782.04
$34,778.59
$28,553.64
Each year's amounts in (b) and (c), above, were determined by multiplying that year's average daily discrepancy between the checks listed on the adding machine tape and the bank deposit slips times the year's total number of deposits. From this amount the year's estimated "processing income"--(b)--was *41 subtracted leaving an estimated "other diverted income"--(c). The "value of groceries taken" was computed by estimating that Fred's family members each consumed $40 in groceries per month. Respondent disallowed the sick pay exclusions and a portion of the deducted meals expenses. Respondent further determined that petitioners are liable for additions to tax under section 6653(b). OPINION Issues 1 and 2. Diverted Corporate Income
A. Customer and refund checks
Respondent contends that petitioner diverted corporate funds to himself by receiving and failing to place customer checks in the store's cash register and later substituting such unrecorded checks for currency when he prepared the bank deposit slips. According to respondent, such diversions included customer checks for (1) current grocery and meat purchases, (2) payments on charge accounts, and (3) deer and antelope processing. To support this contention, respondent points to a consistent pattern of discrepancies between the amounts of the checks and the currency shown on the adding machine tapes reflecting the cash register receipts and the amounts of checks and currency shown on the deposit slips. Respondent *42 asks us to accept Strutz' testimony that these discrepancies reflect petitioner's diversions of corporate funds to his own use. Petitioner testified that the cash register contents were counted and adding machine tapes reflecting the count were prepared at the end of each day, whereas the deposit slips were not prepared until the following mid-day or afternoon. He points out that the total amounts of the cash register receipts and the deposits were approximately the same each day. According to petitioner, the difference between the amounts of currency and checks as reflected by the adding machine tapes and deposit slips did not represent diversions of corporate funds. Rather, he testified, the store had many regular customers for whom he, Doris, or Strutz cashed payroll or personal checks, substituting such checks for the currency shown on the adding machine tapes for the previous day. Also, some charge account customers gave the store checks for sums larger than the amounts applied on their accounts and received cash for the difference. The $60 working capital placed in the cash register at the beginning of each day was insufficient to provide the currency needed to cover all *43 of these transactions. To remedy this, the currency accumulated from the prior day's operation was dipped into and the customer checks substituted therefor. To corroborate his testimony, petitioner points to several undisputed facts. First, petitioner was ill and away from the store for about a week beginning September 2, 1969, and the same pattern of discrepancies between the amounts of the checks and currency shown on the adding machine tapes and the deposit slips continued while he was away. The fact that the discrepancies continued in petitioner's absence indicates that he was not diverting corporate funds to his own use in the manner determined by respondent. Second, Doris prepared many of the deposit slips and Strutz prepared others, and there is no discernible difference in the ratio of checks to currency on the deposit slips prepared by Doris and Strutz and those prepared by petitioner. Had petitioner been covertly substituting checks for currency this would not have been true. Third, petitioner introduced in evidence copies of the store's deposit slips for July 23, 1965, to September 30, 1965, a period prior to the years in controversy, and for February 17, 1970, to *44 April 27, 1970, a period after petitioner was divorced and he had severed his connection with the store.While the adding machine tapes reflecting the cash register receipts are not available for these periods, the rations of currency to cash shown on these deposit slips is approximately the same as the ratios shown on the deposit slips for the years in controversy. Petitioner cannot be held responsible for the post-December 8, 1969 transactions, and they appear to be about the same as the ones during the years in controversy.
Respondent's case to the contrary is built almost exclusively on Doris' admissions to a revenue agent and Strutz' testimony taken by deposition. The revenue agent's office audit began about the time Fred and Doris separated, and his field investigation began in January 1970, shortly after Doris had obtained a divorce decree awarding her practically all the property, including the store, she and petitioner had accumulated. During this period her health was failing and she was eventually declared an incompetent. The clear inference is that the settlement was not amicable and that it produced deep hostility on her part. In any event, the information she supplied *45 does not materially aid respondent's case. It raises serious questions only with respect to the income received from processing deer and antelope meat. After petitioner left the store and Doris became the principal shareholder, Strutz became business manager of the corporation. He testified that Fred converted some of the store's checks to his own use. But Strutz' testimony was general, was not corroborated, and, in our view, was not entirely credible. Strutz was obviously biased and hostile toward petitioner.On January 28, 1970, near the date on which the revenue agent began his field investigation, Strutz wrote Fred a letter accusing him of embezzling corporate funds and threatening to expose him unless he restored the funds. Strutz made this threat even though petitioner and Doris owned all the corporation's stock when the alleged embezzlements occurred. [5] The inference is that Strutz sought to use the threat of an Internal Revenue Service investigation to improve Doris' (and indirectly his) financial position. We do not find his testimony convincing. *46 On consideration of all the evidence, we think petitioner has carried his burden of showing that he did not divert corporate funds to himself by substituting unrecorded customer checks for currency. As to the two refund checks deposited in the Draper State Bank, respondent offered no evidence other than the fact the deposits were made. Petitioner admits he took the checks from the corporation but maintains he substituted his own currency for them. The checks were deposited in his and Doris' personal account in the Draper State Bank because that bank maintained a group life insurance plan for its depositors of which he wanted to take advantage.He deposited the checks rather than currency to avoid the necessity for transmitting currency through the mails or obtaining a money order. Draper was some 70 miles from Pierre.We find petitioner's testimony sufficient to constitute a prima facie case. In the absence of any other evidence other than the bare fact the checks were deposited, we find that petitioner did not omit $160.60 and $152.99, the amounts of the checks, from his 1966 and 1967 income. B. Deer and antelope processing
With regard to the deer and antelope processing *47 activity, petitioner has failed to offer evidence which would prove that either he or the corporation reported income therefrom during 1966 through 1969. Nonetheless, petitioner did establish that respondent's determination of omitted income from this activity was excessive. Respondent's evidence on this issue came from two sources: Strutz' testimony and the statements made by Doris to the investigating revenue agent. Strutz testified that Fred processed between 200 to 300 deer and antelope per year and charged between $40 to $50 for each one. The investigating revenue agent verified that Doris loaned her nearly completely-owned corporation $2,500 on February 23, 1970. She told him this money came from Fred's deer and antelope processing activities.
On consideration of all the evidence, we find that Fred realized unreported income from deer and antelope processing in the following amounts: Year
Amount
1966
$ 750
1967
750
1968
2,500
1969
3,800
Issue 3. Groceries Issue
Respondent contends that petitioner recognized income of $1,440 in both 1966 and 1967 equal in value to the groceries which he took from the store without paying the corporation *48 for his, Doris', and Gloria Jean Bauman's consumption. Respondent estimated each would consume $40 of food per month. Petitioner conceded that he took groceries worth $1,440 in 1968 and $480 in 1969 and thereby recognized income in those amounts. He also admits that he took groceries during 1966 and 1967. However, he argues that respondent's determinations are excessive and that he paid the corporation for the groceries. Petitioner failed to present any records or other corroborating evidence showing that he paid the corporation for the groceries. We agree with respondent on this issue. Issue 4. Travel Expense Deduction
Respondent argues that Fred is not entitled to $40 of the $60 meal expense deduction claimed on his and Doris' joint 1968 Federal income tax return since Fred was not away from home overnight when he incurred the expenses. We agree. Section 162(a)(2) provides that: There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (2) traveling expenses *49 (including amounts expended for meals * * *) while away from home in the pursuit of a trade or business; * * * The phrase "away from home," as pertinent here, has been interpreted to exclude trips requiring neither sleep nor rest. United States v. Correll,389 U.S. 299, 303, 306-307 (1967), revg. 369 F.2d 87 (6th Cir. 1966). Since Fred has established that he was away from home only one night, and since respondent has prorated Fred's claimed meal deduction of $60, allowing a deduction of $20 for meals relating to that one night, the meal expense deduction should be disallowed only to the extent of $40. Issue 5. Sick-pay Exclusion
Respondent argues that Fred should not be allowed sick-pay exclusions of $1,282.82 for 1967 and $2,905 for 1968 with respect to Doris since the corporation did not have a wage continuation plan covering its employees. We agree. Section 105(a) provides that "amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts *50 * * * are paid by the employer." However, subsection (d) allows an exclusion, within certain limits, for payments described in subsection (a) if they constitute wages or payments in lieu of wages and are paid during a period in which the employee is absent from work on account of personal injuries or sickness. In addition, subsection (e) provides that "amounts received under an accident or health plan for employees * * * shall be treated as amounts received through accident or health insurance" as referred to in subsection (a). Since there was no evidence presented that the payments were received under either accident or health insurance or under an accident or health plan for employees (i.e., a wage continuation plan, see section 1.105-4 (a)(2)(i), Income Tax Regs.), Fred should have included the purported sick pay in the 1967 and 1968 Federal income tax returns. Issue 6. Section 6653(b) Fraud Penalty
Respondent determined that at least part of petitioner's underpayments of tax for the years in controversy was "due to fraud" within the meaning of section 6653(b). *51 The burden of proving this determination by clear and convincing evidence rests with respondent. Sec. 7454(a). Rule 142(b), Tax Court Rules of Practice and Procedure.
To support his determination, respondent relies, first, upon the alleged 4-year consistent pattern of discrepancies between the amounts of the checks and currency reflected on the adding machine tapes of cash register receipts and the bank deposit slips. As discussed above, those discrepancies insofar as they relate to customer checks have been adequately explained and they provide no basis for a finding of fraud.
Second, he points to Strutz' testimony that, on one occasion, Fred flashed some money and checks in his wallet and stated that: "This is some that Uncle Sam isn't going to get." Even assuming that such an ambiguous statement, if made, was sufficient to support a finding of fraud, for the reasons stated above we do not think Strutz' testimony is sufficiently credible to provide the requisite clear and convincing proof of fraud.
Third, respondent refers to Fred's alleged lack of cooperation, but the evidence does not show the kind of lack of cooperation from which we could infer an effort to conceal fraud. *52 In November 1971, the revenue agent telephoned Fred in Pampa, Texas, where he was then living, and asked for bank statements, cancelled checks, and deposit slips in respect of two bank accounts, one at the Pierre National Bank in Pierre, South Dakota, and the other in Pampa. This telephone conversation was an unsatisfactory one, and the revenue agent followed it with a letter dated November 10, 1971. Fred did not respond to this request for bank account data, and the revenue agent did nothing else to obtain the information. At that time, the revenue agent could have obtained most of the information on the South Dakota account by simply serving a summons on the local bank which was located near where the agent had his office. We do not think Fred's failure promptly to respond to this request shows he was attempting to conceal fraud in the filing of the returns in question. Finally, respondent points to Fred's omission from his income tax returns of some of the income received from the processing of deer and antelope, and we have found that Fred failed to report some of this income. Our finding is based largely on the fact that petitioner, who handled his trial pro se, failed *53 to deal with this point extensively in his testimony.His failure appears to have been an oversight rather than a tacit admission that he sought to conceal this income. In any event, the omissions are relatively small, and we do not think they will support a finding that part of the underpayment was due to fraud within the meaning of section 6653(b). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. Except in issue 6 dealing with the sec. 6653(b)↩ addition to tax, "petitioner" or "Fred" will refer to Fred J. Melsa.
3. See Nordstrom v. Commissioner,50 T.C. 30↩ (1968). 4. See Flanagan v. Commissioner,T.C. Memo. 1976-116; Costello v. Commissioner,T.C. Memo. 1976-399; but see Gilday v. Commissioner,62 T.C. 260, 262↩ (1974). Since tax liability of the petitioners for the 1966, 1967, and 1968 tax years is joint and several, we have limited Doris' liability with respect to the income tax deficiencies for those years to the amounts herein found to be due from Fred.
5. The Jan. 28, 1970, letter contains the following: The present board of directors are inclined to drop any future proceedings if these funds are returned to the firm. Otherwise all assembled evidence will be placed in the hands of the proper authorities.
Any action such as this will alert the Internal Revenue Service also the Director of Revenue of South Dakota.↩